ESSEX INSURANCE COMPANY,
Plaintiff,

v.

H & H LAND DEVELOPMENT COR-
PORATION, Bobby A. Holcomb, Sr.,
Bobby A. Holcomb, Jr., Robin Malone,
Randy Blair, and The McNeal Agency,
Inc., Defendants.

Civil Action No. 5:06–cv–5(CAR).

United States District Court,
M.D. Georgia,
Macon Division.

Nov. 14, 2007.

Alycen A. Moss, Jennifer A. Kennedy–Coggins, Kenan G. Loomis, Atlanta, GA, for Plaintiff.

Lawrence C. Collins, Byron, GA, Adam P. Princenthal, C. Cooper Knowles, Atlanta, GA, Frederick Anthony Johnson, Duluth, GA, for Defendants.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

C. ASHLEY ROYAL, District Judge.

Plaintiff Essex Insurance Company brought this declaratory judgment action to determine whether it is obligated to provide insurance coverage for a claim filed against its insured, H & H Land Corporation. Essex has also brought a claim for indemnity against the McNeal Agency, to the extent that it is liable to H & H. Before the Court are motions for summary judgment filed by Essex (Doc. 42) and by the McNeal Agency (Doc. 41). Upon review of the evidentiary materials submitted by the parties, the arguments of counsel, and the relevant legal authorities, the Court finds that there are no genuine issues of material fact and that both Essex and the McNeal Agency are entitled to judgment as a matter of law. Accordingly, and for the reasons set forth below, both motions are **GRANTED**.[1]

At the heart of this case, Essex disputes that it has any obligation to provide coverage to H & H for amounts that H & H paid to settle a lawsuit filed by Robin Malone and Randy Blair ("the Malone/Blair litigation"). Malone and Blair are property owners whose property is adjacent to a residential subdivision developed by H & H in Peach County, Georgia. The subdivision was named "The Orchard," in memory of a peach orchard that was bulldozed to make way for the new houses. Construction of the Orchard began in 1999. On August 30, 2004, Malone and Blair filed a suit against H & H, alleging that the development of the Orchard artificially increased the surface water run-off from the property, causing their properties to be damaged by the excess storm water and the silt, sediment, and debris that accompanied it. Initially, Essex undertook to defend H & H under a reservation of rights. On November 14, 2005, one day before a scheduled mediation of the case, Essex issued a letter to provide notice that it was denying coverage and withdrawing its defense. The November 14, 2005 letter states that Essex denied coverage because the damage to the Malone and Blair properties was a "known loss" not subject to coverage under the Essex policy. The policy provides coverage for property damage only when "prior to the policy period, no insured ... knew that the ... 'property damage' had occurred, in whole or in part." As such, a loss that was known to have occurred prior to the policy period is not covered.

Essex originally denied coverage based on documents relating to complaints by another homeowner, Ron Carter, made prior to the policy period. The policy period for the Essex policy began on February 28, 2004. A March 9, 2000 letter from the City of Byron to Mr. Carter represents that Byron officials met with Bobby Holcomb, Jr., on February 22, 2000 "to discuss off-site drainage concerns from the Orchard subdivision." Amended Complaint (Doc. 27), Ex. G. Essex concluded, based upon this documentation, that coverage for the Malone and Blair action was precluded by the policy's known loss endorsement.

Shortly after Essex denied coverage and withdrew from the defense, the scheduled

---

1. As a result of the granting of Essex's motion for summary judgment, Essex's motion to strike the affidavit filed by H & H in opposi-

tion to its motion (Doc. 62) is moot and is accordingly **DENIED**.

mediation took place and the case was settled. The settlement agreement provided that Malone and Blair were to receive a total of $195,000. H & H contributed $25,000 of its own funds to the settlement and two other insurers, not involved in the present action, paid the rest. H & H never contested Essex's denial of coverage and never made a demand for the $25,000 it paid in settlement or for the attorney fees it incurred in defense of the claim. Nevertheless, Essex filed this declaratory judgment action on January 5, 2006. H & H answered and filed a counterclaim to recover the settlement amount and the attorney fees. Based on allegations in the counterclaim that H & H had disclosed the Carter complaints to its insurance agent, McNeal, prior to obtaining the Essex policy, Essex filed an amended complaint, asserting claims for indemnity against McNeal as a result of its failure to disclose the earlier complaints by Ron Carter.

▮ Essex has now moved for summary judgment. Although H & H has filed no response to Essex's motion, McNeal has. On motion for summary judgment, where the non-moving party bears the burden of proof at trial, the moving party has the initial burden to demonstrate by reference to "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there is an absence of evidence to support the essential elements of Plaintiffs claims. *Hickson Corp. v. Northern Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir.2004). Where the moving party bears the burden of proof, it must demonstrate that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *Irby v. Bittick*, 44 F.3d 949, 953 (11th Cir.1995). Even if a motion for summary judgment is unopposed, the district court cannot base its decision on the mere fact that the motion is unopposed, but must consider the merits of the motion and review the evidentiary materials submitted by the parties to determine whether there are any genuine issues of material fact that preclude judgment as a matter of law. *U.S. v. One Piece of Real Property Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir.2004).

▮ In this case, Essex asserts that H & H's loss in settling the Malone/Blair litigation was not covered by its policy, and that coverage is barred by specific policy exclusions, such as the known loss exclusion and the contamination exclusion. H & H, the insured, has the initial burden of proving that its loss was covered under the terms of the policy. *Chix v. Georgia Farm Bureau Ins. Co.*, 150 Ga.App. 453, 258 S.E.2d 208 (1979). As the insurer, Essex has the burden to prove the applicability of any policy exclusions that it asserts as a basis for the denial of coverage. *First Specialty Ins. Corp., Inc. v. Flowers*, 284 Ga.App. 543, 544, 644 S.E.2d 453 (2007).

Of the three independent grounds it argues for summary judgment, Essex primarily relies upon the known loss exclusion that it cited as the sole basis for denial of coverage in its November 14, 2005 letter. In addition, it argues that the loss for which H & H was liable was not an "occurrence" as defined in the coverage provisions of the policy and that recovery of benefits is excluded by the policy's contamination endorsement. There are genuine issues of material fact that preclude summary judgment based on the known loss exclusion and the terms of coverage provisions. With regard to its third argument, however, Essex has shown as a matter of law that the claims asserted by Malone and Blair are excluded from coverage by the contamination exclusions.

▮ Although the known loss exclusion was the reason given for Essex's original

decision to deny coverage and is the primary basis of its motion for summary judgment, Essex has failed to show that there are no genuine issues of material fact as to whether the loss in question was indeed a known loss. The known loss exclusion appears in the Essex policy as an amendment to the insuring agreement, which excludes liability coverage where any insured knew that the property damage in question had occurred prior to the policy period. Georgia law requires courts to interpret the terms of an insurance policy by the same rules of construction applied for any ordinary contract. *Boardman Petroleum Inc., v. Federated Mut. Ins. Co.*, 269 Ga. 326, 327, 498 S.E.2d 492 (1998). There are "three well-known rules" relevant particularly to the interpretation of insurance contracts:

> [1] Any ambiguities in the contract are strictly construed against the insurer as drafter of the document; [2] any exclusion from coverage sought to be invoked by the insurer is likewise strictly construed; and [3] insurance contracts are to be read in accordance with the reasonable expectations of the insured where possible.

*Id.* at 328, 498 S.E.2d 492.

Although there are no Georgia cases applying or construing a "known loss" exclusion similar to the one in the Essex policy, the language of the exclusion is simple and unambiguous. The loss at issue in this case is the liability for property damage to the property of Robin Malone and Randy Blair caused by the excessive runoff of surface water from the Orchard, as alleged in the Malone/Blair complaint. Under the terms of the policy, property damage is deemed to be known when any insured:

> (1) Reports all, or any part, of the ... "property damage" to [Essex] or any other insurer;

> (2) Receives written or verbal demand or claim for damages because of the ... "property damage"; or

> (3) Becomes aware by any other means that ... "property damage" has occurred or begun to occur.

The third definition of known loss is the one relevant to this case. Essex has presented no evidence that anyone at H & H ever reported the alleged property damage to the Malone and Blair properties to any insurer or that H & H had received a demand or claim for damages from Malone or Blair prior to the policy period. To merit summary judgment, therefore, Essex must show that there is undisputed evidence that H & H was aware that property damage to the Malone and Blair properties had occurred or begun to occur prior to February 28, 2004.

The evidence in this case is not undisputed, and a reasonable jury would not be compelled to find that the property damage to the Malone and Blair properties was a "known loss" subject to the policy's exclusion. Essex's evidence that H & H knew of the property damage relates entirely to complaints by a neighboring landowner, Ron Carter, in 2000 and 2001. There is no evidence of any complaints by Malone or Blair. The evidence shows that Carter initially expressed concerns about the potential for groundwater contamination from the development as soon as construction began. In February of 2000, he wrote to the Mayor of Byron concerning the flooding of his driveway. The Mayor's response to this letter indicates that City officials met with Bobby Holcomb, Jr., to discuss remedial measures to address the problem. A year later, Carter made another complaint. In a letter to Bobby Holcomb, Jr., dated March 20, 2001, Carter claimed that moderate to heavy rains within the previous two weeks had again flooded his and his neighbors' property

and that the runoff had left behind silt deposits.

There is evidence that H & H responded to Carter's complaints by taking remedial action, and had reason to believe that this action was sufficient to address the problem. In response to Carter's March 20, 2001 letter, Bobby Holcomb, Jr., wrote and informed Carter that he had conducted an inspection of the site with the City Engineer and an official of the USDA Department of Natural Resources. He reported that these officials found the drainage measures to be adequate, but promised to make additional improvements. Bobby Holcomb, Sr., has testified in his deposition that additional remedial measures taken in response to Carter's concerns included the building of additional detention areas and the installation of erosion fabric and rip-rap. There is no indication in the record of any complaints from Carter or any other neighboring property owner after these additional measures were taken.

■ The evidence before the Court does not compel the conclusion that H & H was aware that the alleged property damage to the Malone and Blair properties had occurred prior to the policy period. A jury would be entitled to draw its own inferences from this evidence and determine for itself whether the complaints expressed by Ron Carter were sufficient to make H & H aware that property damage was occurring on the Malone and Blair properties as well. Given the absence of evidence of complaints after March 2001, the jury would also be authorized to consider whether H & H had reason to believe its remedial measures had eliminated the problem of excess runoff from the Orchard. On motion for summary judgment, the Court must consider all evidence in the light most favorable to the non-moving party and draw any reasonable inferences in that party's favor. As such, the evidence before the Court presents genuine issues of material fact with regard to the known loss provision, and summary judgment would be inappropriate.

Essex has a stronger argument with regard to the coverage provisions of the policy and its definition of an occurrence, but upon close analysis this argument proves inconclusive and there are persistent questions of fact as to the intent of the parties. The Essex policy provides coverage only for property damage caused by an "occurrence," which is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Although the term "accident" is undefined in the policy, Georgia law concerning occurrence-based liability policies has defined the term by distinguishing accidental events from intended events. Thus, an accident is "an unintended happening rather than one occurring through intention or design." *Allstate Ins. Co. v. Grayes*, 216 Ga.App. 419, 421, 454 S.E.2d 616 (1995). Georgia courts have further observed that policies such as the Essex policy in this case are meant to cover injuries from accidental means rather than accidental injuries. *Provident Life and Accident Ins. Co. v. Hallum*, 276 Ga. 147, 147, 576 S.E.2d 849 (2003). "An accidental injury is an injury that is unexpected but may arise from a conscious voluntary act. In contrast, an injury from accidental means is one that is the unexpected result of an unforeseen or unexpected act that was involuntarily or unintentionally done." *Id.* at 148, 576 S.E.2d 849. As an occurrence based policy, the Essex policy covers liability only for injuries that arise from acts that were accidental or unforeseen. It does not cover liability for injuries that arise from intentional acts, even if the resulting injury is unforeseen.

Essex argues that the excessive runoff from the Orchard onto the Malone and Blair properties was the unexpected result of a conscious, voluntary act, that is, the construction activity and development on the Orchard property. In developing the Orchard, H & H intentionally removed much surface vegetation, altered the contours of the land, and paved areas that had formerly been permeable soil. This land-altering activity was completely intentional, even though the increased runoff that resulted from the activity was not an intended result of that activity. Thus, argues Essex, the property damage was not caused by an "occurrence," but by an intentional act.

The distinction between an accidental "occurrence" and an intentional or expected event proves to be extremely subtle and difficult to make. Georgia case law related to the definition and application of the occurrence requirement in liability policies reflects this difficulty, and it is difficult to reconcile the fact-specific holdings of the various cases. Essex has relied primarily on three cases to support its position. Two of these cases are federal district court cases that have only persuasive authority. The Court has found other cases that appear to be inconsistent with the cases cited by Essex. Often, it is almost impossible to compare the specific facts of one case to the specific facts of another. Curiously, none of the cases seems to acknowledge the inherent ambiguity of the term "occurrence" or to consider the application of the doctrine of *contra proferentum* to such a policy term.

One of the cases on which Essex relies, *Georgia Farm Bureau Mutual Insurance Co. v. Vanhuss*, 243 Ga.App. 26, 532 S.E.2d 135 (2000), is factually similar to this case, in that it deals with the question of coverage for claims by neighboring property owners arising from the runoff of surface water and sediment. The policy at issue in *Vanhuss* was an occurrence policy that defined an occurrence as an "accident." [2] The court noted that complaints by the neighboring property owners alleged that the insured intentionally caused the property damage, and that the insured did not allege any additional facts which would give rise to coverage. Based on this observation, the court determined that the release of surface water onto the neighboring property was not an occurrence subject to coverage.

There are important facts that distinguish this case from *Vanhuss*. As in *Vanhuss*, the Malone/Blair complaint which gave rise to this case alleged that the neighboring property owners made repeated requests for H & H to amend the situation and further alleged that the increased runoff was intentional. In this case, however, there are additional facts which could contradict the claimants' allegations that the runoff was intentional. As noted above, there is uncontradicted testimony in the record that H & H made attempts to remedy the drainage problems that Ron Carter described in his complaints. The testimony of Bobby Holcomb, Sr., indicates that he believed these efforts to have been effective and that he was unaware of continuing runoff problems prior to the Malone/Blair lawsuit. Based on this testimony, a reasonable jury might

---

**2.** The policy in *Vanhuss* differs from the Essex policy, in that it defined an "occurrence" as "an accident ... which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." *Id.* at 26, 532 S.E.2d 135. The additional language is not significant, however. Although the *Vanhuss* policy states that the injury must be unexpected or unintended, it is still primarily an "injury by accidental means" policy, because the injury must result from an "accident," itself unexpected or unintended.

conclude that the runoff was not intended by H & H.

The comparison between this case and *Vanhuss* brings out one of the conceptual difficulties in determining whether a particular injury is caused by an accidental occurrence. In *Vanhuss,* the property damage at issue was caused by the runoff of surface water. The court found that there were no facts to contradict the claimants' allegations that the runoff was an intentional result of the operation of the insured's poultry farm. In this case as well, the property damage at issue was the result of excess runoff. The evidence suggests that the runoff was the unintended result of development and construction activities, and that H & H made unsuccessful efforts to prevent such runoff. The construction activities that created the conditions that led to the increase in runoff were intentional, however. The question arises, then, whether the property damage results from the unintentional runoff or from the intentional construction activity. At what stage in a chain of causation does intent come into play?

The two federal cases on which Essex relies suggest that any intentional activity would preclude coverage, even if that activity had an unexpected result that in turn led to damages. The first such case is *Owners Insurance Co. v. James,* 295 F.Supp.2d 1354 (N.D.Ga.2003), in which the insured was the manufacturer of an allegedly defective stucco siding product. The manufacturer had been sued in a counterclaim by a construction company that had been sued by homeowners for damages to the home caused by the stucco. The court found that the damages were not the result of an occurrence because the installation of the stucco had been an intentional act. In reaching this conclusion, the court distinguished between an unintentional act and an intentional act with unintended consequences.

In a pair of related decisions involving facts almost completely similar to the facts in this case, the Northern District applied the reasoning of *James* to deny coverage. *See, Owners Insurance Co. v. Chadd's Lake Homeowners Association,* Case No. 1:03–cv–205 (N.D.Ga., Dec. 28, 2004) (Order); *Owners Insurance Co. v. Chadd's Lake Homeowners Association,* 2006 WL 1553888 (N.D.Ga., May 20, 2006). In the *Chadd's Lake* cases, a homeowner's association filed a claim against a construction company for damage to a lake caused by excessive runoff and sedimentation from the company's construction site. The construction company's insurer sought declaratory judgment that it was not obligated to provide coverage for the claims, as they were not the result of an occurrence covered by the policy and as they were excluded by the policy's pollution exclusion. The insured construction company argued that it had taken all reasonable precautions to prevent the discharge of silt, sediment, and storm water runoff, and that "because they took such precautions, any discharge of these materials constitutes an 'accident . . ., neither reasonably foreseeable . . ., nor easily preventable by them.' " Slip Opinion, at p. 19–20.

The court rejected this argument, relying on *James* and reasoning that the damages, though unintended, were caused by the insured defendant's intentional construction activities. *Id.* at 23. As the court reasoned, "[t]he fact that the . . . Defendants anticipated this damage would result from its activities and attempted (unsuccessfully) to prevent the damage does not render their intentional conduct accidental—to the contrary, it underscores the intentional quality of their conduct." *Id.*

This Court finds the reasoning of *Chadd's Lake* and *James* to be unpersuasive. If the logic of these cases were to be

universally applied, the "occurrence" based policy would essentially provide coverage only from random events that involve no element of intent or conscious action. Of course, most such events could not give rise to liability requiring coverage in the first place. Almost every conceivable accident for which an insured could be held liable involves some intentional action at some point in the chain of causation. A person who trips while walking may not have intended to trip, but his stumble would have been the result of the intentional act of putting his foot down in a particular place. Despite the intentional act of walking in a particular place, a reasonable person would be disinclined to call the resulting stumble anything but an accident. In this case, the intentional act of developing the property could be compared to the act of taking a step in a particular direction, whereas the drainage problems that resulted from the construction could be compared to the stumble. Although the construction work was intentional, the runoff that occurred was not intentional. It was the unintentional runoff, not the intentional construction, that caused injury to the neighboring property owners.

Two Georgia cases are consistent with this approach and suggest that the excessive runoff from the Orchard property could be considered accidental, even if the construction that led to the problems was intentional. In *Allstate Insurance Co. v. Justice*, 229 Ga.App. 137, 493 S.E.2d 532 (1998), the insured was involved in a shoot-out with a third party, when a stray bullet struck the claimant. The insured contended that his actions were taken in self-defense and that he had no intent to injure either party. Asked to determine whether the claimant's injuries were the result of an occurrence under the terms of the liability policy, the Court of Appeals determined that there were questions of fact that precluded summary judgment. The pulling of the trigger was an intentional act; the direction in which the gun was pointed or in which the bullet traveled was not. It was not the insured's intent to shoot at or in the direction of the injured claimant. Based on these facts, the court held that judgment as a matter of law was inappropriate and "the jury could find that the shooting was an accident caused by a stray bullet and an 'occurrence' within the meaning of the family liability policy at issue." *Id.* at 139, 493 S.E.2d 532.

The second Georgia case that raises questions about the requirement of intent is *State Automobile Insurance Co. v. Thomson*, 180 Ga.App. 90, 348 S.E.2d 507 (1986). In *Thomson* the insured was a landlord who wrongfully evicted a tenant and moved the tenant's furniture out to the street. The tenant's furniture was damaged as a result of exposure to the elements. The court affirmed a denial of summary judgment and held that the damage could have been found to be the result of an occurrence covered by the landlord's liability policy. Construing the evidence most strongly in favor of the insured, the court reasoned that the landlord neither expected nor intended to damage the property of the tenant, but only intended to evict the tenant. Even if the eviction was intentional, the damage to the furniture was the result of intervening circumstances that were not intended by the insured landlord:

> Thus, if [the tenant's] property was damaged, it was not as the immediate and sole result of an act on the part of [the landlord] which was calculated to accomplish that damage, but solely as the result of the circumstances leading up to and then accompanying this particular act of eviction. Viewing the eviction "from the standpoint of [the landlord], as the insured," he sought only to have the property removed from the premises and, if the property was subse-

quently damaged by exposure to the elements, it was attributable to [the tenant's] earlier failure to have removed it herself or to have been present at the premises to make arrangements for its disposition as it was being physically removed therefrom.

*Id.* at 91, 348 S.E.2d 507.

■ *Thomson* is comparable to this case, in that the event that caused the injury was not intended by the insured, although that event was in turn set in motion by an intentional act.[3] In *Thomson* the event that directly caused the tenant's injury was the rain that fell on the tenant's property. In this case, the damage to the neighboring properties was caused by excessive runoff from the Orchard property during rainstorms. The evidence before the Court does demand a finding that this excessive runoff was intentional. Based on evidence of remedial measures taken by H & H, a jury could find that the runoff was unintended and unforeseen. Although the construction activity on the Orchard was clearly intentional,[4] the evidence indicates that H & H intended to prevent an increase in surface water runoff from the property. The failure of those measures could be found to have been unintentional.

*Thomson* particularly illustrates the conceptual difficulty of the accidental/intentional analysis in the context of occurrence based liability policies. In *Thomson* the court split, and three judges dissented from the decision, reasoning that because the eviction itself was clearly intentional, the damage to the property that was removed was the result of an intentional act and was not an occurrence. The minority's argument is more consistent with the argument advanced by Essex in this case, and by the district courts in *James* and the *Chadd's Lake* cases. The majority opinion, which is binding authority, weighs in favor of H & H, and indicates that a jury should be allowed to consider whether the damages to the Malone and Blair properties resulted from an "occurrence."

■ Although there are genuine issues of material fact that preclude summary judgment on the basis of the Essex policy's known loss exclusions or its restriction of coverage to injuries caused by an occurrence, Essex is nevertheless entitled to summary judgment based on its pollution exclusion. The pollution exclusion is found in the policy's "Combination General Endorsement," and excludes coverage for

> any litigation or administrative procedure in which any Insured or others may be involved as a party as a result of actual, alleged, or threatened discharge, dispersal, seepage, migration, release, escape or placement of pollutants, environmental impairments, contaminants into or upon land, premises, buildings, the atmosphere, any water course, body of water, aquifer or ground water, whether sudden, accidental or gradual in nature or not, and regardless of when.

The term "Pollutants" is defined to mean

> any solid, liquid, gaseous, fuel, lubricant, thermal, acoustic, electrical, or magnetic irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, fibers, radiation, acid, alkalis, petroleums, chemicals, or waste.

Essex has presented persuasive authority that storm water runoff and the resulting sediment deposits are "contaminants"

---

**3.** *Thomson* also illustrates the conceptual difficulty of the accidental/intentional analysis. Three judges dissented from the decision, reasoning that because the eviction itself was clearly intentional, the damage to the property that was removed was the result of an intentional act.

**4.** It is difficult to imagine construction work taking place accidentally.

excluded by the terms of such a pollution exclusion. One of those authorities is the *Chadd's Lake* decision from the Northern District of Georgia, discussed above in the context of the occurrence debate. In his December 28, 2004 Order, Judge Duffey found that a substantially similar pollution exclusion was unambiguous, and that it excluded coverage for runoff and sedimentation. The policy in *Chadd's Lake,* consistent with the policy in this case, defined "Pollutant" to include any solid, liquid, gaseous or thermal irritant or contaminant. In making his decision, the judge was persuaded by an unpublished Eleventh Circuit *per curiam* opinion, *Owners Insurance Co. v. Lake Hills Home Owners Association, Inc.* (11th Cir., Dec. 30, 2002).

The *Lake Hills* opinion is especially persuasive. The Eleventh Circuit in that case considered that the term "irritant" could be defined as anything that annoys and the term "contaminant" could be defined as something that makes "impure or unsuitable by contact or mixture with something unclean, bad, etc." *Lake Hills,* Slip Opinion at p. 5–6 (quoting *Random House Unabridged Dictionary,* 438, 1010 (2d Ed.1987)). The court concluded that under the plain language of the policy, silt, sediment, and storm water runoff were irritants or contaminants and constituted pollutants subject to the exclusion. Although unpublished opinions of the Eleventh Circuit "are not controlling authority and are persuasive only insofar as their legal analysis warrants" (*Bonilla v. Baker Concrete Constr. Inc.,* 487 F.3d 1340, 1345 n. 7 (11th Cir.2007)), a well-reasoned and directly on-point decision by a panel of the Eleventh Circuit is impossible to ignore. Following the lead of the Eleventh Circuit panel in *Lake Hills,* the Court finds that the pollution exclusion in the Essex policy acts to exclude the claims made by Malone and Blair from coverage under the policy and entitles Essex to judgment as a matter of law.

In light of the granting of summary judgment to Essex, the motion for summary judgment by McNeal is rendered moot. Essex, in its claim against McNeal, alleges that McNeal is obligated to indemnify it for any coverage it must pay to H & H for the Malone/Blair litigation. This indemnity claim is based on the contention that McNeal failed to disclose a known loss. Although there are genuine issues of material fact as to whether there was any known loss to be disclosed, Essex is entitled to summary judgment on the basis of its pollution exclusion. Because Essex has no liability to H & H under its policy, it has no indemnity claim against McNeal.

**SO ORDERED.**